IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

F IL ED

02 JAN 18  AM 10: 26

U.S. DIST
N.D. OF ALABAMA

SHERRILL BRYANT, WANDA            )
SHOEMAKER, and VICKI WRIGHT,      )
                                  )
        Plaintiffs,               )
                                  )
v.                                )   CIVIL ACTION NO. 99-JEO-1472-NE
                                  )
JACKSON COUNTY HEALTHCARE         )
AUTHORITY d/b/a JACKSON COUNTY    )
HOSPITAL; ER PHYSICIAN'S GROUP,   )
P.C.; and RONALD GRAHAM, D.O.,    )
                                  )
        Defendants.               )

**ENTERED**

**JAN 1 8 2002**

## MEMORANDUM OPINION

Plaintiffs Sherrill Bryant, Wanda Shoemaker, and Vicki Wright have filed this action,

asserting various claims against the defendants, Jackson County Healthcare Authority ("JCHA"

or "Defendant"), doing business as the Jackson County Hospital ("JCH"), ER Physicians Group

("the ER Group"), and Dr. Ronald Graham ("Graham"). This case is before the court on the

motion for summary judgment filed by JCHA (doc. 77) and the motion to strike filed by

Plaintiffs Bryant, Shoemaker, and Wright (doc. 94). For the reasons set forth below, Plaintiffs'

motion to strike and Defendant's motion for summary judgment are due to be granted and

Plaintiffs' claims are due to be dismissed with prejudice.[1]

---

[1] This court previously dismissed the plaintiffs' claims against HealthCare Authority of the City of Huntsville, d/b/a ER Physicians Group and Huntsville Hospital (doc. 85). The court has also dismissed the plaintiffs' claims against Graham and Graham's counter-claims against Shoemaker. (Doc. 88). The remaining claims allege a sexually hostile work environment and retaliation against JCHA. (Doc. 84, Plaintiffs' Brief at 1). The plaintiffs have abandoned any invasion of privacy claim they may have had against JCHA. (*Id.* at 44).

## I.  MOTION FOR SUMMARY JUDGMENT

### A.  Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is

2

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer*

3

*Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility

determinations, the weighing of evidence, and the drawing of inferences from the facts are the

function of the jury, and therefore the evidence of the nonmovant is to be believed and all

justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant

need not be given the benefit of every inference but only of every reasonable inference. *Brown v.

City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ

on the inferences arising from undisputed facts, then a court should deny summary judgment."

*Allen*, 121 F.3d at 643.

### B.  Facts[2]

#### 1. Generally

At the time of the events at issue in this case, Plaintiffs were employed by Defendant as

registered nurses in the emergency room ("ER") department of JCH.  Plaintiffs Bryant and

Wright began working in the ER in 1993; Plaintiff Shoemaker began working in the ER in 1995.

JCH is operated by Defendant JCHA.  Defendant entered into a contract with Huntsville

Healthcare Authority ("HHA").  Pursuant to this contract, HHA would provide qualified ER

physicians.  In accordance with the terms of the contract, HHA provided Graham to act as the

medical director of Defendant's ER.  Graham began working in the ER at JCH in August or

September of 1995.  He was given the title of "medical director," although he was not

Defendant's employee.

According to Plaintiffs, Graham consistently and continuously made sexual remarks

---

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiffs. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

and/or remarks derogatory to women.  He made some of these remarks to Plaintiffs directly and some of these remarks to other female nurses.  Each Plaintiff contends that she was aware of Graham's conduct toward the other female nurses.

### 2. Wanda Shoemaker

Shoemaker began working "full-time hours" at JCH in August 1995 and was given a "full-time position" in June 1996.  (Shoemaker Depo. at 26-27).[3]  The complained-of conduct began soon after Graham arrived.  Shoemaker heard Graham talking about "pulling the girl's pants down" at the last hospital where he worked.  (*Id.* at 61-62, 96-98; Shoemaker Aff. ¶ 2.i).[4] When she told him that he had better not do that to her, he laughed.  (Shoemaker Depo. at 100). She also heard Graham make comments in 1995 about wanting to have intercourse with a prostitute.  (*Id.* at 93-95).

In early 1996, when Shoemaker was walking up the stairs at work one day wearing a skirt, Graham said, "I'd love to be under the stairs looking up at you."  (Shoemaker Depo. at 63-64; Shoemaker Aff. at ¶ 2.iii).  Later that year, around October 1996, Graham made various comments at the hospital that he could see the "panty lines" of the nurses when they bent over. (Shoemaker Depo. at 89-90; Shoemaker Aff. at ¶ 2ii; Wright Depo. at 79).[5]  Shoemaker did not witness these comments, but was told about them at some point by a co-worker, Vella Thornhill[6]. (Shoemaker Depo. at 90-91).  Graham also told Shoemaker in October 1996 that his wife called

---

[3] Shoemaker's deposition is found at document 84, tab 7.

[4] The affidavit is found at document 84, tab 2.

[5] Wright's deposition is found at document 84, tab 9.

[6] Thornhill's notes of various events are found at document 79, tab 7, Defendant's Ex. 5.

the ER nurses prostitutes. (*Id.* at 62, 118-19).

Graham also stated that he preferred to treat "good-looking, well-dressed female patients over poor, poorly-dressed patients." (Shoemaker at 108-09). He called one female patient, "a fat bitch." (*Id.* at 109). This incident occurred about October 1996. (*Id.* 109-10, 184-85; Shoemaker Aff. at 2.iii).

In October 1996, Shoemaker was counseled by Lorey Tigue, the head nurse, concerning a comment Shoemaker made that she would not bring her dog to the hospital with Graham there. (Shoemaker Depo. at 180). During this counseling session, Shoemaker told Tigue about certain aspects of Graham's conduct, including a statement he had made when he overheard a conversation between the nurses about motorcycles. Graham stated, "I bet that's the most exciting thing she's . . . had between her legs in a long time."[7] (Shoemaker Depo. at 184). Tigue prepared a memorandum of the session. It provides:

> On October 3, 1996 I met with you [Shoemaker] to share my concerns about some comments you made. I asked you if, in fact, you said among co-workers, "I wouldn't bring my dog to this hospital." And, "I used to like my job here, but I don't anymore because of the idiot doctors we have here." You acknowledged making these comments, but didn't remember using the word "idiot".
>
> You elaborated on your comment about the doctors, sharing that a physician made some offensive comments regarding other individuals. You also said that same physician made some offensive comments to you. You chose not to elaborate nor offer any quotes regarding comments made directly to you. You indicated that you told the physician when those comments were made that you did not like hearing such comments. You also told the physician not to make comments of that nature to you again.
>
> My understanding is that such incidents have not recurred since you advised the physician of your displeasure, and that you will advise me immediately if they do recur. Rest assured, the hospital is committed to maintaining a workplace free

---

[7] This was a reference to another nurse in the ER.

6

from harassment. In view of explained circumstances surrounding your comment to co-workers about physicians, I advise more thoughtful discretion in the future.

Nevertheless, in regard to your other comment (not bringing your dog to this hospital), you are warned in the strongest terms possible that the hospital's mission is to provide the highest possible quality of care to the community we serve. To that end, we expect employee allegiance, especially in your attitude and influence among co-workers assigned to provide such care. I consider your comment subversive and counter productive to all that the hospital hopes to represent.

Be advised that any similar comments or actions may result in further disciplinary action up to and including the immediate termination of your employment.

(Doc. 79, Tab 7, Bates No. 0341).[8]  After the meeting, Shoemaker wrote Tigue a note stating that she was concerned about the session being kept confidential. (*Id*. at No. 0346 (Defendant's Ex. 30)). Although Shoemaker acknowledged that her remark about the hospital was unprofessional, she reiterated to Tigue that Graham was trying to make her look bad. (*Id*. at 0347). Shoemaker stated that she felt that Tigue's write-up of the incident was in retaliation for Shoemaker's having made prior complaints about Graham. (Shoemaker Depo. at 128).

During 1997, Shoemaker also heard Graham talking about a person having sex and observed him make sexual gestures. (Shoemaker Depo. at 47-48, 50, 104-05, 264-66; Shoemaker Aff. at ¶ 2.v). She told him that she was tired of this conduct, that he had no business doing that, and that she did not appreciate his foul mouth. (*Id*.). Shoemaker stated that there had been similar instances in the past, but this is the first time she complained about it to Suzanne Arnold, one of her supervisors. (Shoemaker Depo. at 46-53).

---

[8] The Bates numbers are located in the lower right-hand corner of the particular document, beginning with the letter "D". This document is also labeled Defendant's Exhibit 29.

7

Shoemaker was suspended on June 26, 1997.[9]  (*Id.* at 128).  This was just two or three days after she made an oral complaint about Graham.[10]  (*Id.* at 129).

At some time in late 1997 or early 1998, Graham talked to Shoemaker and other hospital employees about conducting pelvic exams on female patients.  He stated, "[I]f I ever have to do a pelvic [exam] on her [(a woman from the hospital office)], be sure to leave her high heels on [during the exam]."  (Shoemaker Depo. at 102-03; Shoemaker Aff. at ¶ 2.iv).

In about July 1998, Graham made various statements to Debi Ferguson describing vegetables and other objects as phallic in appearance.  (Shoemaker Depo. at 101-02; Bryant Depo. at 81-82).[11]  Ferguson told Shoemaker about these comments.  (Shoemaker at 100-02).  Shoemaker did not personally witness these statements.  (*Id.*).

Shoemaker also observed nurse Jackie Hall and Graham going into an ER examination room and closing the door.  Graham told Shoemaker that he was "popping" Hall's back.  (Shoemaker Depo. at 54).  Although she did not see what they were doing inside, Shoemaker felt that they should have "cleaned up" the room by straightening the bed.[12]  (*Id.* at 54-57).  Shoemaker also stated that Graham could not keep his eyes off of Hall.  (*Id.* at 260).  Graham also "gawk[ed]" at the other nurses when they would bend over.  (*Id.* at 63).  On another occasion, Graham "threw his tongue out" when "some pretty girls" were walking through the ER.

---

[9] The date on this document is also referenced as July 1, 1997.  (Shoemaker Depo. at 129).  The difference is not significant under the circumstances.

[10] The details of this suspension are not in the record.  There is a general claim of retaliation in the complaint; however, there was no statement therein or argument in the brief that this action was in retaliation for her complaints about Graham.  (Doc. 1 (Complaint) ¶¶ 12, 27-28; Plaintiffs' Brief at 40-43).

[11] Bryant's deposition is found at document 84, tab 8.

[12] Shoemaker did not think they were having sex.  (Shoemaker at 257-58).

(*Id.*; Shoemaker Aff. at ¶ 2.v).

At various times, Graham also made negative comments on Shoemaker's performance while commenting that he was glad to see "good" nurses in the emergency room. (Shoemaker Depo. at 110-12). Shoemaker felt that Graham did not treat the ER nurses with the proper respect. (*Id.* at 112-13).

Shoemaker complained about Graham's actions to supervisory personnel 15-25 times. (Shoemaker Depo. at 42, 88, 119-20, 200-01). At least three were written. The first was in October 1995. (*Id.* at 66). The next two were in the latter part of 1996 or early 1997. (*Id.*). Others were written between the end of 1995 and the middle of 1997. (*Id.*). She also complained to Tom Calvert, another doctor in Graham's group. (*Id.* at 188-92). She further told members of the JCHA Board during a visit to the ER that they had "a serious problem with a doctor." (*Id.* at 194).

Shoemaker met with Merbil Reeves, the Director of Nursing, on July 3, 1998. (Shoemaker Depo. at 140). Reeves was conducting an investigation concerning Graham. These included (1) Graham talking about pulling down a nurse's pants, (2) Graham stating that his wife called the nurses "prostitutes," and (3) Graham "slinging" a chair at a nurse.[13] (*Id.*). Shoemaker informed Reeves of her three prior written complaints. (*Id.* at 141-42). She also told Reeves of her prior oral complaints to Lorey Tigue. (*Id.*). Reeves said that they were well aware of the problems with Graham and that it was the hospital's responsibility to protect the nurses. (Doc. 84, Tab 44 (Defendant's Ex. 34, pp. 5-6, 10)). She also said that they were in the process of trying to do something with him. (*Id.* at 6-7). Shoemaker attributed any dissatisfaction with the

---

[13] The nurse involved in this incident was not one of the plaintiffs.

ER to Graham and Tigue. (*Id.*). Reeves told Shoemaker that they were going to work at making

changes to improve things overall. She further stated that if it still was not "right" for some

people, she would offer them a transfer out of the ER. (*Id.* at 8-9). Shoemaker stated that she

agreed with that. (*Id.*).

In March 1999, Shoemaker talked with Mark Griffith, a nurse at the B[aptist] M[edical]

C[enter] DeKalb, after she heard that Graham was going to work there. (Shoemaker Depo. at

154-57). She told Griffith that Graham had an EEOC complaint filed against him by some of the

nurses at JCH. (*Id.* at 156, 296-97, 301-02). She also told him that Graham "would stab him in

the back, just to watch himself." (*Id.* at 156).

On March 18, 1999, Graham wrote a letter to Ronald Sparkman, JCH's Administrator,

complaining about Shoemaker's call to Griffith. (Doc. 84, Tab 32 (Defendant's Ex. 44)).

Susanna Chang,[14] the Director of Nursing, spoke with Shoemaker about the letter. Shoemaker

was questioned about the letter and told by Chang that she would investigate the matter and be

back in touch with her. (*Id.* at 175).

Shoemaker was terminated by Chang on March 31, 1999. (Shoemaker Depo. at 147,

175-76). The reason given for the termination was "falsification or improper handling of records

(personnel, payroll, other)" as well as "dishonesty/fraud in attending inservice class." (Doc. 84,

Ex. 35; Shoemaker Aff. at ¶ 7). The incident was described as follows:

> October 16, 1998, Wanda was scheduled off to attend ACLS class held at NSCC.
> The hospital paid tuition and 8 hours class attendance for Wanda to attend class.
> Wanda's name did not show up on class roster for 10/16/98. A nurse who
> attended said class did not see Wanda present. There was no conflict in work

---

[14] Chang is also referred to herein and in the record as Susanna Lau.

schedule.  On 2/16/99, letter written to Wanda requesting proof of attendance.[15]
(Doc. 84, Ex. 35).

Shoemaker states that, although she did not attend the class, she made up the class on her

own time "a week or so later."  (Shoemaker Depo. at 167).  She did not attend because she was

sick.  (Shoemaker Depo. at 166).  She states that she had not been disciplined for a similar

incident a few years earlier.  (*Id.* at 171).  She further states that numerous other people also

missed a similar class and were not disciplined or questioned.[16]  (*Id.* at 169).  Still further,

Shoemaker states that Cherie Sibley, the Director of Patient Care, told her (Shoemaker) to prove

that she had taken the make-up class.  Sibley also told Shoemaker that if she could not prove that

she had taken the class, JCH would reduce her check for eight hours and that would be the end of

the matter.[17]  (*Id.* at 173).

### 3. Sherrill Bryant

Bryant has been employed by JCH for at least twenty years in various positions.  (Bryant

Depo. at 13).   On April 28, 1998, she complained in writing to Lorey about the fact that Graham

was disrespectful of her and another nurse.  (Bryant Depo. at 28-29; Bryant Aff. at ¶ 7;[18] Defense

---

[15] Chang's letter stated that JCH needed actual proof of her attendance at the class.  It acknowledged that she met the ACLS requirements, but noted that the question was whether she attended the class held on October 16-17, 1998.  (Doc. 84, Tab 30).

[16] When questioned further for specifics, she only named Suzanne Arnold.  However, neither the plaintiffs' brief nor Shoemaker's deposition states what action, if any, was taken against Arnold or even if management was aware that she was paid for attending when she did not.  Defendant contends that the Human Resources Director, Susanna Chang Lau, had the authority to make the decision to terminate Shoemaker and that Lau made the decision consistent with Defendant's policy.

[17] The transcription of the taped conversation also provides that Shoemaker was told that "something would be put in [her] file that [she] did not have proof of attendance for [the class]."  (Doc. 79, Tab 7, Defendant's Ex. 35, p. 4; Doc. 84, Tab 31, p. 4).

[18] This exhibit is found at document 84, tab 1.

Ex. 48).[19]  Specifically, she complained that, when a younger female nurse came to work in the emergency room, Graham commented that "he was glad she was down [t]here – We need a good nurse." (Defense Ex. 48; Bryant Depo. 29-31).  She felt that the comment was degrading. (Bryant Depo. at 30).  Graham had made similar comments in the past.  (Bryant Depo. at 31, 42). Lorey Tigue told Bryant that "they were well aware that they had a problem with Dr. Graham." (*Id.* at 43).

Bryant also heard Graham's comments about the nurse riding a motorcycle.  (Bryant Depo. at 63-64, 87).  She did not have first-hand knowledge of the comments regarding his comments about the nurse uniforms; his comments regarding sexual fantasies, including wanting to have intercourse with a prostitute; his references to vegetables; his references to "bitches"; his comments that his wife referred to the nurses as prostitutes; or any gesturing by Graham.[20]  (*Id.* at 32-39, 53).  She did hear from others that he had made those comments and gestures.  (*Id.*).  She did not have personal knowledge of Graham "slinging" a chair at a "co-worker."  (*Id.* at 47-48). Bryant personally experienced Graham state that he would "rather treat the well-looking, nice-looking, [well-]dressed [female patients] than he had the poorly-dressed people."  (*Id.* at 40-41). She did not recall any specific dates when he voiced this comment.  (*Id.* at 41).  She also heard him make comments about performing pelvic examinations.  (*Id.* at 64-65).  She also heard him make comments in 1997 or 1998 about a mother who brought her child in for an examination. Specifically, she stated that he said, "I had to come out of there [(the examining room)] because that mother is so hot [looking] that she is melting my ink pen.  I can't write."  (*Id.*).  He also told

_____

[19] This exhibit is found at document 79, tab 7.

[20] She stated that she would walk off when he started talking about sex.  (Bryant Depo. at 34).

her that he was close with Reeves and "he could get just about anything he wanted."[21]   (*Id.* at 49).
Graham never touched her in an offensive manner, did not promise her anything in exchange for
sexual favors, or threaten her.   (*Id.* at 61, 85).

### 4. Vicki Wright

Wright began working with JCH in 1975.   (Wright Depo. at 20).[22]   She was promoted to a
registered nurse position in the ER about 1993.   (Wright Aff. at ¶ 1; Wright Depo. at 23).[23]
During her tenure in the emergency room, she made numerous complaints about various matters,
including about 100 complaints to Tigue about Graham.   (*Id.* at 32).   Her only written complaint
concerning Graham was submitted on June 24, 1998.   (*Id.* at 30-33).

Wright did not personally hear Graham's comments about "panty lines" and prostitute
fantasies in October 1996.   (Wright Depo. at 78-80, 200; Wright Aff. at ¶ 3).   She was not
present when the comments about vegetables were made.   (*Id.* at 81).   Wright heard him tell
"lewd, crude and sexually-offensive jokes."[24]   (Wright Aff. at ¶ 3.vi).   Wright acknowledged that
she also told "sexual jokes to co-workers" while at work.   (Wright Depo. at 119).   She told Tigue
that she (Wright) felt "belittled and humiliated" by Graham.[25]   (*Id.* at 32, 34).   She stated that in
about March 1997, Graham commented that "we didn't need any of us [(the ER nurses) applying
for a supervisory] position, that we needed a man to have the job so that they could keep these

---

[21] Bryant did not believe that he was implying any type of sexual relationship existed by this comment. (Bryant at 49, 51). She believed it was a show of his power. (*Id.* at 51).

[22] The deposition is found at document 84, tab 9.

[23] This affidavit is found at document 84, tab 3.

[24] One example was provided. The frequency of the jokes was not specified.

[25] She also felt that he belittled the patients. (Wright Depo. at 32).

'whining women' under control." (*Id.* at 36-37). Graham also told her that she "should be given the relief shift in the emergency room because [she] was not married and didn't have any children living at home." (*Id.* at 38). This occurred in about October 1997. (*Id.* at 42). He also stated that she and her co-workers were "over the hill" and that she should be moved to floor work so that Shawn Wheeler could work in the emergency room. (*Id.* at 42-45, 56). He said this because "we needed males and we needed younger people." (*Id.*). He made these comments more than once and specifically on or about June 23 or 24, 1998. (*Id.* at 45). Wright complained about these comments to Tigue, who stated that she (Wright) should "[j]ust ignore him." (*Id.* at 54). Graham also told Wright that Jeffrey Brown, the Administrative Director for the ER Group, referred to her as "the 'queen bitch;'" but she does not know when that was. (*Id.* at 45-46, 56). Graham also made negative comments in her presence about the emergency room nurses when nurses from other departments at the hospital came to work in the ER. He would state, "Now we have got some good nurses." (*Id.* at 55). He also complained that the emergency room nurses were "whining women." (*Id.* at 56).

In March 1997, some of Wright's co-employees complained about working with her and another nurse. (March 4, 1997 Note).[26] Wright was counseled by Tigue. (*Id.*). Wright filed a grievance concerning Tigue's action to Merbil Reeves, the Director of Nursing, and then to David Brown, the Director of Human Resources. Wright believed that Tigue's action was in retaliation for being "one of the few people who would stand up and openly complain to management about things." (Wright Depo. at 73). She also believed that she was being singled out because of her complaints about Graham. (*Id.*). However, she did not mention any

---

[26] This note is found at document 79, tab 7, Bates number 0361 (Defense Ex. 9).

complaints about sexual harassment during her discussions with Brown.  (*Id.* at 74).

In about October 1997, Tigue revised the work schedule for the ER nurses to improve staffing during peak hours.  According to the memorandum regarding the revisions, changes were to be determined using employee assignment requests, and when that was not possible, premised on performance evaluations.  (October 6, 1997 Tigue Memorandum).[27]  Wright was moved to the relief shift, purportedly based, at least in part, on low performance evaluations.[28]  (Wright Depo. at 50-51).  She filed a grievance in December 1997, challenging the reassignment and asserting that Tigue was retaliating against her.  (*Id.* at 51; Wright Grievance).[29]  The decision to change her shift was upheld.  (Wright Depo. at 58).  That decision was appealed to the Jackson County HealthCare Authority Board.  The reassignment was again affirmed.  (*Id.*).

Wright repeatedly heard Graham refer to her and the other nurses as "'a bunch of bitches.'"[30]  (Wright Depo. at 86-87).  Graham was also vocal about the fact that he thought that some of the emergency room nurses should be moved to other "floor" work in different areas of the hospital.  (*Id.* 88-89).  Wright was aware of Graham's comments about the nurse on the motorcycle, pelvic examinations, and treating attractive women.  (*Id.* 89-90, 99-102).  Wright also heard Graham state "that he was glad to see 'good' nurses in the emergency room" when "younger, 'prettier' nurses from other floors or departments were assigned to work in the emergency room."  (*Id.* at 101, 103-04, 128).  She also heard his comments that he and Reeves

---

[27] This memorandum is found at document 79, tab 7 (Defendant's Ex. 8).

[28] Wright disagreed with Tigue's low evaluations of her.  (Wright Depo. at 155).

[29] This grievance is located at document 79, tab 7, Bates No. 00370 (Defendant's Ex. 6).

[30] Wright acknowledged in her deposition that she used the words "bitch" and "f–k" herself about 25 times each during the same period.  (Wright Depo. 116-17).

were "buds" and that he could get what he wanted from her.[31]  (*Id.* at 104).  She did not

personally hear his comments about the nurses in the emergency room that he attributed to his

wife.  (*Id.* at 106).  Graham did, however, accuse her of sleeping with the Board of Directors at

the hospital.  (*Id.* at 107).  Graham also told various sexually offensive jokes.  (*Id.* 109-10).

Wright saw the pictures he took while on vacation that depicted female buttocks.  (*Id.* at 111).

She also heard his remarks about clerks passing through the emergency room, such as "I'm

panting like a dog," "Don't step on my tongue," and "Don't slip in my drool."  (*Id.* at 112-13).

   In June 1998, Wright told two JCH Board members who were visiting the emergency

room about a morale problem there.  (Wright Depo. at 122).  She did not tell the Board members

about any sexual harassment or discrimination.  (*Id.* at 122, 164).  She was interviewed by

Reeves following her complaint.  (*Id.* at 123).  Reeves summarized her investigation in a

memorandum.  It provides:

> In regards to V. Wright's conversation with [Board Members] Mr. Alley and Mr.
> Cagle I have completed my interviews of all ER personnel.  I can find no one that
> has applied for work elsewhere.  Three people stated they might leave for other
> opportunities, Monday, through Friday jobs, day job, etc.
>
> I think we do have problems that need to be addressed.  Some are minor, but for
> the sake of morale need to be addressed.  Examples are: 1) dress code,
> 2) weekends off for people working 7A-7P, and 3) scheduled overtime a problem for
> some.  Lorey will appoint a committee to work on dress code.  She and I will revise
> the scheduling of off days.  You have already authorized the addition of 2 part time
> nurses to help eliminate overtime.
>
> I have identified two major problems that must be dealt with.  We have at least 3
> nurses working ER that are so unhappy with everything that they are creating a
> workplace that is not conducive to good patient care.  In fact, most complaints
> from other nurses is having to work with these three.  With your permission I will

---

[31] By way of example, he said that he had gotten the dress code changed on the nurses' uniforms. (Wright Depo. at 104).

again speak with V. Wright, Sherrill Bryant and Wanda Shoemaker regarding my findings. At that time I will inform them of my plan to transfer them to another nursing unit. This will present problems for us but I feel for the sake of patient care and this department we must take this position. Dr. Graham is another serious problem that somehow must be dealt with. He does not have a single supporter among the nursing staff. The complaints against him are not patient care related. I think we have ample documentation on file about Dr. Graham.

Our evaluation process has been interpreted by some personnel as being to [sic] harsh. I have instructed all Head Nurses to have a pre evaluation conference with any employee that is not meeting standard. This conference will take place at the time it is determined that the employee needs to improve and in ample time to improve before official evaluation time.

(Doc. 79, Tab 6, Plaintiffs' Ex. 94).[32] Wright told Reeves that Tigue was the source of the

morale problem; she did not complain about Graham or his conduct. (Wright Depo. at 124-25).

On June 24, 1998, Wright filed a written complaint that Graham had stated that the nurses

were "a bunch of bitches." (Shoemaker Depo. at 91; Wright Depo. at 127; Transcript of July 13,

1998 Meeting).[33] She also said that this was not the first such reference and that Graham

frequently made such comments when nurses from other floors were brought in. (Id.). She was

interviewed by Chang about the incident and her complaints concerning Graham, including that

he made comments about wanting nurses moved from the ER to other floors at the hospital and

that he made comments about the nurses' panty lines.[34] (Id.). Graham and another witness to the

June 24, 1998, incident also were interviewed. Graham denied the allegation and stated another

---

[32] The memorandum also includes notes from the interviews of twelve ER employees. (Id.).

[33] The transcript of the meeting is found at document 79, tab 7, Bates No. 0431. A second version of the transcription is also found at document 79, tab 7, Defendant's Ex. 18.

[34] Wright told Chang that as recently as the morning of the interview that Graham had made a sexually-related comment about a squash that someone brought into the hospital. (Doc. 79, Tab 7, Bates No. 0433).

nurse witness recalled that he was asking "why is everyone so bitchy?"[35]  (July 13, 1998 Graham

Letter).[36]  At her deposition, Wright stated that she was not sure what he had said that day.

(Wright Depo. at 87).

Wright also told another doctor in Graham's medical group that Graham was hard to

work with, that he "talked down" to the nurses and that he "talked down" to females in general.

(Wright Depo. at 164).  The doctor stated that other nurses had voiced concerns as well.  (*Id.* at

165).

On August 17, 1998, Wright was notified that she was to be reassigned to another unit

effective the next day.  (Doc. 79, tab 7, Defendant's Ex. 15).  Reeves' notice to Wright stated:

> Since our meeting on June 16, 1998 regarding problems in the ER,[[37]] I have
> spoken with each nursing employee assigned to the emergency room.  Most agree
> that we have some problems.  A plan has been developed to deal with these and
> should be implemented in its entirety soon.
>
> Vickie, one major problem identified is that we have a few employees assigned to
> the ER that might be happier and create less stress for the other personnel if they
> were reassigned to another unit.  Therefore with the approval of Mr. Armour[, the
> Hospital Administrator,] and Ms. Chang you will be reassigned to SCU/5th floor
> effective August 18, 1998.  Your shift will be 7A-7P. . . .

(*Id.*).  Wright did not agree with the reassignment and stated that she did not want to be moved.

(*Id.*).  When she talked with Reeves about it, Reeves told her that "she felt that it would be best

for the department."  (Wright Depo. at 124).  Wright believes that this transfer was in retaliation

for filing the June 24, 1998 complaint against Graham.  (Wright Depo. at 169-71).  Thereafter,

---

[35] Kenneth Strawn, a Scottsboro Police Officer who was at the hospital, stated that he recalled Graham's comment was that he was "working w[ith] a bunch of bitching nurses."  (Doc. 79, Tab 6, Bates No. 0426 (Plaintiff's Ex. 93)).

[36] This letter is found at document 79, tab 6, Plaintiff's Ex. 15, p. 1.

[37] These problems concern the morale issues mentioned to the JCH Board members and about which Reeves interviewed Wright in June 1998.  (Wright Depo. at 122-24).

she applied for a number of shifts in the ER and she was not selected for reassignment.

Defendant contends that Wright was reassigned to the fifth floor to improve relations among the

ER nurses. Defendant states, that Wright, Shoemaker, and Bryant were "unhappy with

everything." Reeves described the situation in a memorandum. She stated that they were

> creating a workplace that is not conducive to good patient care. In fact, most
> complaints from other nurses is having to work with these three. With your
> permission I will again speak with V. Wright, Sherrill Bryant and Wanda
> Shoemaker regarding my findings. At that time I will inform them of my plan to
> transfer them to another nursing unit. This will present problems for us but I feel
> for the sake of patient care and this department we must take this position.

(Doc. 79, Tab 6, Bates No. 0435, (Plaintiff's Ex. 94)). In the memorandum, Reeves also stated:

> Dr. Graham is another serious problem that somehow must be dealt with. He
> does not have a single supporter among the nursing staff. The complaints against
> him are not patient care related. I think we have ample documentation on file
> about Dr. Graham.

(*Id.* (underlining in original)). The reassignment did not result in a loss of pay. Wright was

transferred back to the ER around March 1999.[38] (Wright Depo. at 24).

### 5. Defendant's Complaints about Graham

Defendant complained of Graham's behavior to HHA,[39] about one time for each year that

Graham was assigned to JCH. Defendant complained by letter. The first letter was sent on

November 8, 1996, and it stated, in part, "Although it appears that the problems have been

resolved, the hospital would like to take this opportunity to affirm its commitment to maintaining

a workplace free from all forms of unlawful harassment. In addition we are requesting written

---

[38] Since returning to the ER, Wright did not receive the position of Medical Management Coordinator that she applied for and when she was made a team leader, she states that she was not paid the additional fifty cents ($.50) per hour that other team leaders were paid until she complained in May 2000. (Wright Aff. at 6). She also asserts in conclusory fashion that she is paid less money than the other less experienced and younger nurses. (*Id.*).

[39] The letter is addressed to Jeff Brown at Huntsville Hospital System. (Doc. 84, Tab 22).

communication from you, assuring us that your organization and Dr. Graham will support Jackson County Hospital's harassment policy . . . ." (Doc. 84, Tab 22).

The following year -- September 3, 1997 --  Defendant sent HHA another letter, again reporting that Graham had made comments of an inappropriate, sexual manner.  Again, Defendant asked HHA to assure that Graham understood he had to follow Defendant's harassment policy.  (Doc. 84, Tab 23).

On June 25, 1998, Defendant sent a third letter reporting that Graham made inappropriate, sexual comments to ER department employees.  (Doc. 84, Tab 24).  This letter, referencing an allegation that Graham had referred to the nurses as "bitches", states, "Many nurses feel that this is a form of sexual harassment because they feel that he talks down to them all the time." (*Id.*; Shoemaker Aff. at ¶ 2.vi).  Again, Defendant asked HHA for assurance that Graham would support Defendant's harassment policy.  (Doc. 84, Tab 24).

 On July 22, 1998, less than one month later, Defendant sent HHA another letter, informing it that Graham had made personal remarks about one of the nurses[40] to other nurses.  In this letter, Defendant stated that replacing Graham should be discussed.  (Doc. 84, Tab 25).  HHA's Brown told Armour that because Graham was an "independent contractor," HHA could only terminate his contract.  It did not have the authority to discipline or suspend Graham. Armor then advised HHA that it was in JCH's interest that Graham no longer provide services at the hospital and asked that he be taken off the schedule.  (Brown Depo. at 58).

On September 22, 1998, Plaintiffs filed their EEOC charges.  On October 22, 1998, Graham learned that he would be leaving JCH.

---

[40] This incident did not involve the plaintiffs herein or sexual harassment.

## II. MOTION TO STRIKE

### A. Generally

Plaintiffs have filed a motion to strike the evidence submitted by JCHA with its reply brief. (Doc. 94). JCHA has filed a response to the same. (Doc. 96). Included in the items to which Plaintiffs object are the affidavit of Susanna Lau (doc. 92) and the exhibits attached to Defendant's brief.

The rule is well-established that a moving party may not submit additional evidence with its reply brief, without allowing the nonmoving party an opportunity to respond. The reason for this rule is obvious – the nonmoving party must be allowed at least "a reasonable and meaningful opportunity to challenge a motion for summary judgment." *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1516 (11th Cir. 1990) (citing, *inter alia, Winbourne v. Eastern Air Lines, Inc.*, 632 F.2d 219 (2nd Cir. 1980) ("purpose of Rule 56(c) is to permit nonmoving party a meaningful opportunity to challenge motion for summary judgment")).

> Recognizing the importance of giving the nonmovant a meaningful opportunity to respond to a motion for summary judgment, this circuit has strictly enforced the requirement of a 10 day advance notice that the court will take a motion for summary judgment under advisement as of a certain date. . . . The reasons for such a requirement are premised on the fact that disposition of a case on summary judgment grounds represents a final adjudication on the merits. It forecloses subsequent litigation on the matter; it is accordingly important that proper notice be given so as to insure "opportunity to present every factual and legal argument available.

*Id.* (internal quotations and citations omitted).

When faced with additional evidence submitted by the moving party after the time set for the nonmoving party to file all its evidence in opposition to the motion, the court has two options: "it [can] strike the [evidence] or grant [P]laintiff as the nonmoving party the opportunity

21

to respond to it." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985); *see Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) ("Appellants contend that the district court had no 'permissible choice' but to allow a surreply once it had accepted the materials in Seagate's reply. That contention is incorrect. Having accepted the reply brief, the district court in fact had two permissible courses of action. It could either have permitted a surreply or, in granting summary judgment for the movant, it could have refrained from relying on any new material contained in the reply brief.").

### B. Plaintiffs' Untimely Claims

The court chooses to strike the evidence for various reasons; principally because the court finds that Plaintiff Wright's recent claim regarding a refusal to transfer her back to the ER and her claim regarding a fifty cent pay differential that was not timely paid are not properly before the court. In the brief, Wright contends that the retaliation has continued in that she was not transferred back to the ER when there were openings, she was not immediately paid an extra $.50 per hour when she was promoted to team leader, and other nurses with less experience are being paid more. These allegations are not in her complaint because they allegedly occurred after it was filed. (Doc. 1, ¶ 16 ("After advising management and then the Board about the sexual harassment, Ms. Wright was moved from the emergency room to work on a floor. She considered this a demotion because the work in the ER was work she enjoyed, except for the hostile environment, and she found it more exciting.")).

These claims were not properly presented in a timely manner to the court. Wright may not now add them through arguments in her brief in opposition to Defendant's motion for summary judgment. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997) ("A

plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." (Citation omitted)). These claims could have been added by Wright prior to the filing of the motion for summary judgment. The court permitted the parties until February 15, 2000, to add any new claims. (Doc. 29, p. 1). To the extent that any pay claim occurred after that date, Wright should have filed a motion to amend the complaint so that the allegations could have been properly addressed in the motion for summary judgment. The motion to strike this evidence will therefore be granted. Additionally, as is addressed below, many of Plaintiffs' specific objections to the additional evidence are also due to be granted.

### C. Individual Objections

Plaintiffs' first specific objection to the evidence concerns paragraph four of Lau's affidavit, which states that she (Lau) understands "that Dr. Graham was an independent contractor to JCHA." (Doc. 94, ¶ 5). This is clearly objectionable as being conclusory. Although she states at the beginning of the affidavit that "[t]he facts set forth herein are based upon my personal knowledge and are true and correct" and that she is familiar with JCHA procedures and requirements and personnel changes during her tenure, this statement is still an improper conclusion because it is based on her "understanding" and not articulated facts. (*Id.* at ¶¶ 1-2). Additionally, the court finds that under the circumstances, this evidence is not material to the issues presented on summary judgment.[41]

Plaintiffs' next objection is to paragraph eight of the affidavit, which states:

---

[41] Defendant is not asserting that Graham's status as an independent contractor precludes Title VII liability in this case. (Doc. 91, p. 2). In fact, Defendant asserts that "[t]he only issues before the court is [sic] whether Dr. Graham's alleged conduct was sufficiently severe or pervasive to cross the Title VII baseline, and whether there was retaliation." (*Id.*).

> On or about August 17, 1998, Merbil Reeves, the Director of Nursing, assigned Vickie Wright to work as an [sic] RN on the 5th floor. Ms. Wright was given a full workload, she was given her desired shift (one she had been unable to get in the ER), and she received the same compensation and benefits. She did not have to work with Lorey Tigue, the Head ER Nurse whom Ms. Wright thought was unfair to her, and she did not have to work with Dr. Graham of whom she complains in this lawsuit. The position in the ER vacated by Ms. Wright's [sic] was filed by Cathy Pereira, who was then a 41 year old female RN.

(Doc. 92, ¶ 8). Plaintiffs object that Lau does not state that she had first-hand knowledge of the "decisions, knowledge, or acts of a third party." (Doc. 94, ¶ 6). To the extent that this paragraph attempts to explain Reeves' reasoning in making the change, the objection is due to be sustained. The factual information contained in this paragraph, such as the fact that Wright was transferred, is allowable and contained, for the most part, elsewhere in the record.

Plaintiffs next object to paragraph nine as hearsay. It provides:

> Ms. Wright was transferred out of ER to try to improve relations among the ER nurses. It had nothing to do with her discrimination claims. JCHA denied Ms. Wright reassignment to the ER for approximately one year after her transfer because reassignment at that time would have defeated the purpose of transferring her in the first place. After about a year, Ms. Wright was transferred back to the ER at her request. She is still employed in that capacity at JCHA.

(Doc. 92, ¶ 9). Much of the information in this paragraph does not appear to be hearsay. However, to the extent the statements reflect what is in the mind of others, such as Reeves, the person who reassigned Wright, the motion is due to be granted. Additionally, this information is redundant to other admissible evidence in the record. To the extent that Plaintiffs complain about the statement that Wright's reassignment to the ER "would have defeated the purpose of transferring her in the first place," the court finds the statement is not hearsay but the writer's conclusion that adds nothing to the other admissible evidence already before the court.

Plaintiffs next object to paragraph ten. It provides:

24

> Ms. Wright was denied the position of Medical Management Coordinator
> because Jackie Boozer was better qualified.  In addition to being a registered nurse
> with 5 years experience in a hospital setting, the job required advanced computer,
> communication, research, and analytical skills, experience in utilization review
> and credentialing.  Ms. Boozer met these qualifications.  Ms. Wright did not.  Ms.
> Wright's harassment claims had nothing to do with the decision to award the
> position to Ms. Boozer, the best qualified candidate.  Also, Ms. Boozer's
> experience in compliance and billing have proven useful in that position.

(Doc. 92, ¶ 10).  Plaintiffs assert that this is objectionable hearsay and Lau lacks personal

knowledge because she was not the person who made the hiring decision.  Defendant asserts that

it is justified in submitting this evidence because this was the first opportunity it had to respond

to the allegations.[42]  Plaintiffs also object to paragraph "11," which provides:

> The position of "team leader" did not officially exist, nor was it funded,
> until July 10, 2000.  Beginning in approximately March 2000, when JCHA was
> testing the "team leader" concept, several nurses, including Ms. Wright, tried out
> for the position knowing that it did not involve any additional duties at that time,
> and did not carry any pay increase unless the concept was adopted.  On July 10,
> 2000, the concept was officially adopted.  Vicky [sic] Wright, together with one
> other female nurse and one male nurse, were officially made team leaders with
> additional duties assigned.  All of them were paid their increase on July 8
> retroactively to July 10, and have received that increase since that date. . . .  No
> JCHA nurse received pay as a "team leader" prior to July 10.  Ms. Wright has not
> been treated differently from any other team leaders.

(Doc. 92, ¶ 11).  Plaintiffs state that this evidence is not within the personal knowledge of the

affiant and constitutes hearsay.  Lastly, Plaintiffs object to paragraph "12," which provides:

> I [(Lau)] am not aware of any new nurse employees who possess lesser
> qualifications than Ms. Wright making more money per hour that [sic] her, unless
> they have opted into the program whereby they choose to waive benefits in
> exchange for higher pay.  Ms. Wright has not identified any such persons.  If,
> however, JCHA pays a new nurse more than an existing nurse because of
> competition between hospitals for those nurses, that is JCHA's prerogative.  In
> that case, JCHA's decision would affect all existing nurses such as Ms. Wright the

---

[42] The court also notes that Wright could not have raised this issue at the time of the filing of the complaint since the
events occurred thereafter.  (*See* Doc. 84, Plaintiffs' Brief at 43-44).

same.  Ms. Wright is being treated the same as other nurses at JCHA.

(Doc. 92, ¶ 12).  Wright asserts that this evidence is hearsay or speculation.  (Doc. 94, ¶ 12).

Because the evidence in these three paragraphs relates to the allegations not properly before the

court, they are due to be stricken.

## III. DISCUSSION

### A. Hostile Environment Sexual Harassment

#### 1. Timeliness of the Claims

All three Plaintiffs initially claim that Defendant failed to correct the hostile environment

that existed at JCH and, therefore, the court should not limit its consideration of the evidence to

the period within 180 days of the filing of the EEOC charge.   Defendant asserts that many of

Plaintiffs' claims are untimely.  The court finds Plaintiffs' reasoning more persuasive under the

circumstances.

"Generally, an aggrieved employee may not obtain relief for any alleged discrimination

occurring more than 180 days before he filed his administrative charge with the EEOC.  See 42

U.S.C. § 2000e-5(e).  An exception to the 180-day filing requirement arises when the

discriminatory act constitutes a 'continuing violation' of the statute.  *See Beavers v. American*

*Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir. 1992)."  *Williams v. Alabama Indus. Dev't.*

*Tr'g.*, 146 F. Supp. 2d 1214, 1219 (M.D. Ala. 2001).  "An employee cannot use one timely-filed

EEOC charge as a bootstrap for lapsed claims arising out of other remote, discrete events. *See*

*Carter v. West Publ'g Co.*, 225 F.3d 1258, 1263-65 (11th Cir. 2000) (distinguishing between

ongoing acts of discrimination and single discriminatory acts followed by neutral,

nondiscriminatory consequences); *Lewis v. Board of Tr. of Alabama State University*, 874 F.

26

Supp. 1299, 1303 (M.D. Ala. 1995)." *Williams*, 146 F. Supp. 2d at 1219.

Defendant asserts that only the events occurring on or after March 26, 1998, 180 days

before Plaintiffs filed their EEOC charge, may be considered. (Doc. 78, pp. 23-24). Defendant

relies, at least in part, on *Roberts v. Gadsden Memorial Hospital*, 835 F.3d 793, *modified*, 850

F.2d 1549 (11th Cir. 1988), for the proposition that a "plaintiff cannot litigate time-barred

incidents as a continuing violation when he knew he had a right to file suit earlier – also, no

continuing violation when the plaintiff was denied promotion by two different supervisors three

years apart." (Doc. 78, p. 25). Plaintiffs have not specifically addressed Defendant's assertion

in their brief.

In *Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287, 1301-02 (M.D. Ala. 1999), the court

stated:

> To determine whether alleged discriminatory acts constitute a continuing
> violation, the Fifth Circuit in *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d
> 971 (5th Cir. 1983), articulated a three-prong test, whereby the following
> nonexhaustive factors are to be examined:
>
>> The first is subject matter. Do the alleged acts involve the same
>> type of discrimination, tending to connect them in a continuing
>> violation? The second is frequency. Are the alleged acts recurring
>> . . . or more in the nature of an isolated work assignment or
>> employment decision? The third factor, perhaps of most
>> importance, is degree of permanence. Does the act have the degree
>> of permanence which should trigger an employee's awareness of
>> and duty to assert his or her rights, or which should indicate to the
>> employee that the continued existence of the adverse consequences
>> of the act is to be expected without being dependent on a
>> continuing intent to discriminate?
>
> *Id.* at 981. The *Berry* court noted that "the particular context of individual
> employment situations requires a fact-specific inquiry by a trial judge which
> cannot be easily reduced to a formula." *Id.* at 981-982. This court finds the *Berry*
> rubric to be instructive in determining whether alleged discriminatory acts

constitute a continuing violation and applies it to the present case.[43]

The *Malone* court also stated:

> "[H]ostile work environment harassment generally has a lesser degree of permanence than traditional disparate treatment discrimination." *Otis v. Wyse*, No. 93-2349, 1994 WL 566943, at *4, 1994 WL 566943 (D. Kan. Aug. 24, 1994) (citing *Waltman v. International Paper Co.*, 875 F.2d 468, 476 (5th Cir. 1989); *Purrington v. University of Utah*, 996 F.2d 1025, 1028-1029 (10th Cir. 1993)). In a hostile work environment harassment case, "the employee would be alerted to a hostile work environment claim only after the acts of harassment were sufficiently severe or pervasive to alter the terms or conditions of her employment . . ." *Id.* Additionally, "a hostile work environment plaintiff typically will not be 'alerted' to her Title VII rights until the employer fails to take appropriate corrective actions." *Id.*

*Malone*, 51 F. Supp. 2d at 1302.

In this case, Defendant has not satisfied the court as a matter of law that Graham's actions were of such a "degree" as to limit Plaintiffs' claims to only the six months preceding the filing of the EEOC claims. *Id.* Although numerous distinct incidents are alleged, it was the continuous nature of the conduct that ultimately put Plaintiffs on notice that they should file their complaints with the EEOC. To limit the court's consideration of Plaintiffs' allegations as suggested by

---

[43] The *Malone* court also stated:

> The court notes that the Eleventh Circuit adopted the *Berry* test in Part C of its opinion in *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793 (11th Cir. 1988) ("*Roberts I*"), stating that:
>
> > It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period. . . . In determining the existence vel non of such a nexus, a court should not rely upon a superficial factual analysis, but rather, should refer to a variety of factors. Such factors include whether the claims were related in subject matter, frequency, and permanence (i.e., whether the act was sufficiently permanent in nature so as to "trigger an employee's awareness of and duty to assert his or her rights"). *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983).
>
> *Id.* at 800. *Roberts I* was amended by the Eleventh Circuit on sua sponte reconsideration in *Roberts v. Gadsden Mem'l Hosp.*, 850 F.2d 1549 (11th Cir. 1988) ("*Roberts II*"), wherein the court withdrew Part C of *Roberts I* in its entirety. *Id.* at 1551. Accordingly, this court refrains from stating that the Eleventh Circuit has adopted the *Berry* analysis.

*Malone*, 51 F. Supp. 2d at 1301 n.3.

Defendant is not justified under the circumstances. This is particularly true because Plaintiffs did discuss the situation with Defendant's representatives a number of times and Plaintiffs timely filed their EEOC charge after they were dissatisfied with the results of the June 24, 1998 complaints.

### 2. Analysis of the Claims

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998). To establish a claim for hostile or abusive working environment sexual harassment, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment . . . ; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)). In *Gupta*, the Eleventh Circuit stated:

> The fourth element – that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment" – is the element that tests the mettle of most sexual harassment claims. Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

*Gupta*, 212 F.3d at 583. "Although Title VII's prohibition of sex discrimination clearly includes

sexual harassment, Title VII is not a federal 'civility code.'" *Mendoza*, 195 F.3d at 1245.

"Title VII 'does not prohibit all verbal or physical harassment in the workplace,' and

'does not reach genuine but innocuous differences in the ways men and women routinely interact

with members of the same sex and of the opposite sex.' Instead, Title VII prohibits only the type

of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's

employment.'" *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509

(11th Cir. 2000) (quoting *Oncale*, 523 U.S. at 80-81).

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to

hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to
> alter an employee's terms or conditions of employment includes a subjective and
> an objective component. . . . . The employee must subjectively perceive the
> harassment as sufficiently severe and pervasive to alter the terms or conditions of
> employment, and this subjective perception must be objectively reasonable. The
> environment must be one that a reasonable person would find hostile or abusive
> and that the victim subjectively perceives to be abusive. Furthermore, the
> objective severity of harassment should be judged from the perspective of a
> reasonable person in the plaintiff's position, considering all the circumstances.
>
> The objective component of this analysis is somewhat fact intensive.
> Nevertheless, the Supreme Court and this Court have identified the following four
> factors that should be considered in determining whether harassment objectively
> altered an employee's terms or conditions of employment: (1) the frequency of the
> conduct; (2) the severity of the conduct; (3) whether the conduct is physically
> threatening or humiliating, or a mere offensive utterance; and (4) whether the
> conduct unreasonably interferes with the employee's job performance. The courts
> should examine the conduct in context, not as isolated acts, and determine under
> the totality of the circumstances whether the harassing conduct is sufficiently
> severe or pervasive to alter the terms or conditions of the plaintiff's employment
> and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (internal quotations and citations omitted). The Supreme Court in

*Faragher* held, "We have made it clear that conduct must be ***extreme*** to amount to a change in

the terms and conditions of employment . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775,

788, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998) (citing *Carrero v. New York City Housing

Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-50 (8th

Cir. 1986)) (emphasis added).

      Defendant asserts that Plaintiffs have not sufficiently demonstrated that the environment

in the ER was sufficiently hostile to defeat its motion for summary judgment. (Doc. 78, p. 18).

Plaintiffs disagree.

      The incidents of harassment in this case, which consist of crude and/or lascivious

comments and gestures made to Plaintiffs or to others, unaccompanied by physical contact are

unquestionably offensive and unpleasant.  The inquiry usually is whether they are gender-related

or of a sexual nature and whether they are extreme enough to constitute a hostile and abusive

working environment.  *Gupta*, 212 F.3d 571; *Mendoza*, 195 F.3d at 1247-49 (citing, *inter alia*,

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir. 1998); *Long v. Eastfield College*,

88 F.3d 300, 309 (5th Cir. 1996); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th

Cir.), *cert. denied*, 519 U.S. 818, 117 S. Ct. 70, 136 L. Ed. 2d 30 (1996); *see also Russell v.

Board of Trustees of University of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) ("When

harassing statements are 'directed at someone other than the plaintiff, the impact of [such]

"second hand harassment" is obviously not as great as the impact of harassment directed at the

plaintiff.'" (quoting *McPhaul v. Board of Commissioners*, 226 F.3d 558, 567 (7th Cir. 2000)).  If

the conduct is gender-related or of a sexual nature, Plaintiffs must present sufficient evidence that

the harassment was so severe or pervasive as to alter the terms, conditions, or privileges of their

employment.

Defendant does not parse the various allegations against Graham in terms of whether they are gender or sex related, but instead asserts that even if they are all true, "the conduct does not come close to the Title VII 'baseline.'" (Brief at 19).[44]  Counsel asserts that "[t]he courts of appeals have consistently dismissed claims involving allegations of behavior that is far more 'boorish,' 'offensive,' or 'inappropriate' than Dr. Graham's alleged conduct." (*Id.*).  Counsel goes on to delineate various cases wherein the court found the conduct insufficient. (*Id.* at 19-23).  The only case cited from this Circuit was *Mendoza.*  Therein, the court stated:

> In this appeal, the conduct alleged by Mendoza falls well short of the level of either severe or pervasive conduct sufficient to alter Mendoza's terms or conditions of employment.  Construing the evidence in the light most favorable to Mendoza, she presented evidence of four categories of harassing conduct: (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion."
>
> As an initial matter, whether Page's conduct testified to by Mendoza includes the necessary sexual or other gender-related connotations to be actionable sex discrimination is questionable.  *See Brill v. Lante Corp.*, 119 F.3d 1266, 1274

_____

[44] The court does note that in its reply brief, Defendant states:

> All three Plaintiffs allege that Dr. Graham expressed a preference for treating good-looking, well-dressed female patients over poor, poorly-dressed patients; that he called "prettier" nurses from the other floors "good nurses;" that Dr. Graham gossiped about Carlene Reid; and that he favored "young" nurses because he thought some of the existing ER staff were "over the hill."  Those statements, even if true, are irrelevant.  Pretty versus ugly, or rich versus poor, or poorly-dressed versus well-dressed, are not sex based differences or "protected classes."  Calling female nurses from the floors "good" and implying that female nurses in the ER are "not good" is not sex or gender based.  As for Carlene Reid, she was not an ER nurse, and the alleged gossip was not sexual or gender related, and therefore is irrelevant.  Finally, there is no claim of age discrimination in this case, so alleged age slurs are irrelevant.

(Doc. 91, p. 6).  To the very limited extent that any of these comments by Graham have any sexual or gender-related basis, they will be factored in by the court in its analysis.  The court does note, however, that many aspects of the comments are neither sexual or gender-based.  One exception would be his stated preference for treating female patients.  Placing this comment in context, it will for purposes of this motion be deemed relevant.

(7th Cir. 1997) (rejecting the plaintiff's attempt to buttress a hostile-environment claim with evidence of unpleasant, but non-sexual, conduct); *Galloway*, 78 F.3d at 1167-68 (noting that the term "sick bitch" is not necessarily a sexual or gender-related term). For example, although the statement "I'm getting fired up" could under some circumstances denote sexual or romantic desire, Page's statement that he was "getting fired up" occurred in the context of reacting to a complaint by Mendoza. As she described the interaction: "I went into his office angry and disgusted. . . . Mr. Page turned around and I said to him, 'I came in here to work, period' and his reply to me was 'yeah, I'm getting fired up, too.'" By Mendoza's own description, Page did not approach her but instead, she approached Page while another employee was present in his office. Mendoza also admits that Page said nothing else. Thus, the circumstances of this interaction do not objectively indicate that the statement "I'm getting fired up" had a sexual or other gender-related connotation.

      As another example, although "following and staring" can betray romantic or sexual attraction, the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees. For example, Mendoza described Page's constant "following and staring" as "he always seemed to be wherever I was. If I was in the lunch room, he was there. If I was at a picnic table outside on a break, he was there." Nevertheless, because we conclude that the conduct established by Mendoza was not sufficiently severe or pervasive to alter Mendoza's terms or conditions of employment, we assume, but do not decide, that this conduct is sexual in nature and thus might implicate sex discrimination.

*Mendoza*, 195 F.3d at 1247-48. In rejecting the plaintiff's claim, the court stated: (1) the conduct was not "'physically threatening or humiliating'" and the "cumulative effect of this conduct" did not "'unreasonably interfere[ ]'" with Mendoza's job performance;" (2) the conduct was not severe; and (3) "aside from Page's 'constant' following and staring, the conduct asserted by Mendoza was not frequent."[45] *Id.* at 1248.

---

[45] "She established a single instance of slight physical contact, one arguably inappropriate statement, and three instances of Page's making a sniffing sound. These instances occurred over an eleven-month period and therefore were far too infrequent to alter the conditions under which Mendoza was required to perform her job. . . ." *Mendoza*, 195 F.3d at 1249.

The court also stated:

      To the extent Mendoza's testimony about 'constant' following and staring established the frequency factor, this evidence does not create a jury issue on Mendoza's sexual-harassment claim. There is

In *Gupta*, the complained-of conduct consisted of the following acts over a six to seven month period: (1) "look[ing her] up and down," (2) suggesting lunch at Hooters restaurant, (3) suggesting that she "change into casual attire before dinner," (4) accompanying her and another couple to "a place where single people meet," (5) offering assistance if she needed anything, (6) changing her office to one across from the alleged harasser when she complained her office was too small, (7) offering to drop food at her house, (8) calling her at home two or three times a week late at night and asking if she was in bed, (9) asking if she had a boyfriend, (10) asking her to lunch, (11) calling other faculty members "racist" and "evil," (11) putting a hand on her thigh in the office, (12) touching her bracelet and saying, "Oh, it is a very nice bracelet," (13) touching her ring, (14) touching and lifting the hem of her dress and commenting, "What kind of material is that?," (15) on a hot day when the air conditioning was broken, Gupta walked into the alleged harasser's office when he was expecting her and he had taken off his dress shirt and was wearing an undershirt and "he unbuckled his belt and pulled down his zipper and start[ed] tucking his [dress] shirt in, (16) making comments that she was "looking very

---

no allegation of any staring or following Mendoza outside the workplace or of any calling Mendoza after work. Regarding the workplace, Mendoza admits that Page never followed her in the office part of the plant where Mendoza worked, and thus necessarily spent most of her time. [ ] Indeed, Mendoza did not describe the following as walking close behind her in an intimidating or threatening fashion, but instead simply as Page's showing up when Mendoza happened to be in the hallways, in the lunch room, or at the picnic table outside. In her testimony at trial, Mendoza never described Page's following or staring as 'stalking' or 'leering' or 'intimidating' or 'threatening.' Similarly, none of Mendoza's briefs regarding her Title VII claim before the panel or en banc characterizes Page's following or staring as 'stalking,' 'leering,' 'intimidating,' or 'threatening.'[ ]

Given normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were 'constant' and thus 'frequent' under the *Harris* factors. Also, considering the following and staring described by Mendoza with and in the context of the sniffs, one verbal statement, and one slight touching as Page walked by the fax, we find Mendoza's claim still falls far short of actionable hostile environment sexual harassment.[ ]

*Id*. (footnotes omitted).

beautiful" and that "Indian people are really decent, and the Caribbean and Western people are really promiscuous" and stating that he could tell that she was "innocent and [ ] didn't have much experience," (17) after a storm, commenting that she should have called him since she was alone and he would have spent the night,[46] and (18) other looks that made her uncomfortable. *Gupta*, 212 F.3d at 578-79.

After a jury rendered a verdict for the plaintiff, the Eleventh Circuit held that the evidence did not support a finding of harassment from an objective viewpoint. Specifically, the court stated:

> Except for the phone calls to her home, none of Rhodd's conduct can be described as frequent. Gupta testified that Rhodd phoned her often at 9:30 or 10:00 at night, and over the weekends, and sometimes asked her personal questions during these phone calls. [ ] While Gupta testified that these phone calls were frequent, she never contended that they were intimidating or threatening. At no point during these phone calls did Rhodd ask Gupta for a date or make sexually explicit remarks or innuendos. [ ] Neither the content of Rhodd's remarks nor the number of the phone calls suggests obsessive or stalker-like behavior by Rhodd. While frequently calling an employee at home and making even innocuous inquiries may be annoying or inappropriate behavior, it does not equal severe or pervasive sexual harassment--if it is sexually harassing conduct at all. As for Rhodd's comments about the promiscuity of people from Jamaica as compared to the innocence of people from India, and the opinion he expressed of women, those statements were far from laudatory, but they were also isolated utterances over a period of several months.
>
>     . . . . Gupta did not contend that Rhodd made any inappropriate gestures or comments toward her when he tucked in his shirt. His conduct on this isolated occasion was not "physically threatening or humiliating." . . . .
>
>     . . . . Gupta cannot establish her hostile environment claim with allegations that Rhodd stared at her twice, touched her ring and bracelet once, and kept asking her to lunch. Assuming it was sexual in nature, none of that conduct was severe, threatening, or humiliating. As the Supreme Court has observed, in a normal

---

[46] Gupta understood this as a suggestion "that he wanted to [have a] sexual relationship with [her]." *Gupta*, 212 F.3d at 579.

office setting interaction between employees is to be expected. . . . . What one employee might perceive as conduct which crosses the proverbial line, another might perceive as banter. We cannot mandate that "an employer [ ] be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are 'coming on' to her." . . . . Nor can we mandate that an employer be required to ensure that supervisors never touch employees on the hand or finger or ask them to lunch.

Of all the conduct about which Gupta complains, the most serious is Rhodd's placing his hand on her knee once, and his touching the hem of her dress once. He should not have done either of those things. But those were only two incidents in a period of six or seven months during which they were interacting (out of an even longer period during which the two worked for the University). Each incident was only momentary, and neither was coupled with any verbal suggestions or advances. . . .

. . . . The standard does have an objective component, and applying it we conclude that the conduct and statements in question would not have interfered with a reasonable employee's performance of her job.

We are aware of our duty to examine and consider all of the behavior and conduct of a sexually or gender-related nature collectively in determining whether it meets the "sufficiently severe or pervasive" requirement. We have done so, and it does not. The alleged harassment in this case exemplifies "the ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2284, which the Supreme Court and this Court have held do not constitute actionable sexual harassment. Gupta failed to present evidence that Rhodd's conduct was in any way "physically threatening or humiliating," or that a reasonable person would view the conduct as "severe." *Mendoza*, 195 F.3d at 1246. The Fifth Circuit recently opined, "All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) (citations omitted). This is not such a case.

Furthermore, a finding that Gupta's complaints constitute sexual harassment would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would "trivialize true instances of sexual harassment." *Mendoza*, 195 F.3d at 1252 n.10. Based upon Mendoza, we hold that there was insufficient evidence presented at trial to support the jury's verdict finding the Board liable for hostile environment sexual harassment under Title VII, and we reverse the judgment of the district court on that claim.

In a more recent case, *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234

F.3d 501 (11th Cir. 2000), the Eleventh Circuit reversed the granting of a motion for summary

judgment. The plaintiff claimed that she was sexually harassed when (1) Donnell repeatedly

commented that Johnson had a sexy voice; (2) Donnell called out Johnson's name and winked at

her; (3) Donnell called out Johnson's name and pulled his pants up in an obscene manner,

revealing an imprint of his private parts; (4) Donnell called out Johnson's name and then looked

her "up and down" while staring at her in a sexual manner; (5) Donnell said "Johnson, I like you

and as long as I like you you're going to be all right. You don't have to worry about your job;"

(6) Donnell repeatedly attempted to massage Johnson's shoulders against her wishes;

(7) Donnell stuck his tongue out at Johnson in an obscene manner; (8) Donnell inappropriately

rubbed his body parts against Johnson; (9) Donnell asked Johnson why a person with a body like

hers always covered it up; (10) Donnell commented that he could "pull [Johnson] up" anytime, a

comment Johnson interpreted as a sexual reference; (11) Donnell got close to Johnson's face as if

to kiss her; (12) Donnell commented that Johnson "really knocked him off his feet;" (13)

Donnell stated that "he had to stay on his side of the room;" (14) Donnell commented

inappropriately about sex to Johnson and questioned Johnson about her sex life; and

(15) Donnell asked Johnson if she ever got lonely. *Johnson*, 234 F.3d at 506. The court stated:

> There is no doubt Johnson subjectively perceived Donnell's behavior as
> harassing. Turning to the four objective factors: the conduct alleged by Johnson
> was not infrequent (Johnson points to roughly fifteen separate instances of
> harassment over the course of four months); the conduct was severe (Donnell's
> behavior included giving Johnson unwanted massages, standing so close to
> Johnson that his body parts touched her from behind, and pulling his pants tight to
> reveal the imprint of his private parts); the conduct was physically threatening and
> humiliating (same); and the conduct interfered with Johnson's job performance
> (she could not get along with her on-the-air co-host). This set of facts differs from

37

cases like *Mendoza* and *Gupta v. Florida Bd. of Regents*, where there were fewer instances of less objectionable conduct over longer periods of time. *See Mendoza* 195 F.3d at 1242-43; *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 585 (11th Cir. 2000). The facts of this case are more akin to the "continuous barrage of sexual harassment" in *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 418 (11th Cir. 1999).

*Id.* at 509. In *Dees*, the conduct consisted of the following:

> sexually explicit stories and jokes, to comments about her body or those of male firefighters, to physical harassment. On one particularly humiliating occasion, Jacobs asked Dees to sit on his lap. When she refused, Jacobs picked her up and squeezed her so hard that she urinated in her pants. Jacobs, laughing, then told the other firefighters what had happened. On another occasion, Stewart ground his groin into Dees' buttocks after stating "look at that sexy mama, I could just eat you in that skirt." Rainey propositioned Dees on a number of occasions, whispering in her ear that she was "the kind of woman I like; you're not only beautiful, you're hot-blooded," or telling her that she needed a "sugar daddy" and that with a body like hers, she would not have to work if she listened to him. On numerous other instances, the four men grabbed or slapped Dees' buttocks, groped her leg, or otherwise touched her in a sexually suggestive manner.

*Dees*, 168 F.3d at 418-19. The *Dees* court noted in *dicta* that "it is evident both that Dees subjectively found her work environment abusive, and that a reasonable person would find it so." *Id.* at 422 n.12.

The conduct in the present case does not fit squarely within the parameters of any of the foregoing cases. There were fewer incidents in *Mendoza* over a much shorter period of time than there are in this case. Many of the comments in *Mendoza* arguably were not sexual or gender-related. *Mendoza* involved touching, while this case does not. Although there were numerous instances in *Gupta*, many were not sexual or gender-related and they occurred in a much shorter time span (six to seven months). Each incident of touching in *Gupta* "was only momentary, and neither was coupled with any verbal suggestions or advances." *Gupta*, 212 F.3d at 585. *Johnson*, involved much more physical contact. The court described the conduct as

"physically threatening and humiliating" and interfering with the plaintiff's ability to work. *Johnson*, 243 F.3d at 509. The conduct in *Dees* was much more severe. It was focused directly at the plaintiff, it was extensive, and it involved physical touching.

The court has closely examined each of Graham's actions, the cumulative effect over the extended time period, and what the plaintiffs personally experienced versus what each learned from the others or co-employees. The court finds: (1) although the conduct is offensive, boorish, unpleasant, and reprehensible, it was not physically threatening; (2) it was humiliating, but the cumulative effect did not "unreasonably interfere" with Plaintiffs' ability to perform their jobs; and, (3) although Graham's actions should not be characterized as "the ordinary tribulations of the workplace" (*Faragher*, 524 U.S. at 788), they do not reach that level the Eleventh Circuit Court of Appeals has found necessary for this court to find the conduct sufficiently severe or pervasive so as to "alter the conditions of [her] employment and create an abusive work environment" (*Gupta*, 212 F.3d at 583).

In Shoemaker's situation, Graham's comments that she personally experienced were numerous and persistent. However, they were not sufficiently severe. It is evident that Graham spent a considerable amount of time observing, interacting with and commenting with Shoemaker, including many instances involving sexual references and innuendo. However, there is no evidence suggesting that these activities reached the actionable level of "'stalking' or 'leering' or 'intimidating' or 'threatening.'" *Mendoza*, 195 F.3d at 1249. The fact that she was aware of other instances of inappropriate conduct by Graham from her conversations with her co-employees is not sufficient to overcome Defendant's motion for summary judgment. Shoemaker's experiences with Graham do not rise to the level experienced by the plaintiffs in

39

*Johnson* and *Dees*. Accordingly, summary judgment is due to be granted.

In reaching this conclusion, the court recognizes that "sexual touching, grabbing, fondling (etc.) is simply not necessary." *Breda v. Wolf Camera, Inc.*, 148 F. Supp. 2d 1372, 1377 (S.D. Ga. 2001) (citing *E.E.O.C. v. R & R Ventures*, 244 F.3d 334, 338-39 (4th Cir. 2001)). However, the individual instances and the surrounding circumstances herein are not sufficient to reach that "baseline" for a hostile environment claim to overcome the motion for summary judgment. *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208,1246 n.80 (11th Cir. 2001). If the conduct in *Gupta* and *Mendoza* do not satisfy the "baseline," Shoemaker's situation does not.

Bryant's experiences do not reach the level experienced by Shoemaker. Bryant personally experienced fewer of Graham's comments and actions than Shoemaker. A considerable portion of her knowledge of Graham's conduct is derived from communications with other employees. That is not sufficient under the circumstances. Her experiences with Graham were not physically threatening and he never touched her in an offensive manner. Although the comments she did witness were demeaning and humiliating, they are insufficient as a matter of law to overcome the summary judgment motion.

Wright's experiences are more akin to those experienced by Shoemaker. But they too are insufficient as a matter of law. They did not reach the level that permits this court to conclude that a jury could reasonably find that the conduct was sufficiently severe or pervasive to alter her terms or conditions of employment.

To the extent that Plaintiffs assert that Graham's conduct was not limited to them and that substantiates the pervasiveness of the same (brief at 34), as already indicated, the court has considered the totality of the circumstances to the extent that they impact on Plaintiffs. However,

the totality of the circumstances still does not meet the requisite standard as to each Plaintiff.

Plaintiffs assert that the conduct herein is sufficiently similar to the conduct in *Cross v. State of Alabama*, 49 F.3d 1490 (11th Cir. 1995); thus warranting the denial of the motion for summary judgment. They note that the conduct in *Cross*, consisted of "'glaring looks, piercing looks,' objects thrown at women daily, yelling, screaming and belittling the women and engaging in name calling, derogatory remarks, verbal abuse, finger pointing, and offensive touching." (Plaintiffs' Brief at 33). An examination of *Cross*, however, shows that the conduct was more pervasive than that. The harasser also told the female employees that they "must prove to him that they were not incompetent and they were not inadequate before he would accept the fact that they were [competent]." *Cross*, 48 F.3d at 1494. He also stated that "women belonged barefoot and pregnant." *Id.* at 1495. He called them "dumb," "stupid," and "just a woman." *Id.* He acknowledged that "he 'was tougher on women than he was on men.'" *Id.* at 1495. In one instance, he threw a lighted cigarette at a female employee, ruining her skirt. *Id.* In another instance, during a meeting with a female employee, he pulled a pistol out of a desk drawer and laid it on the desk with the barrel pointing toward the female employee. *Id.* at 1499. In a terse examination of the evidence, the court found that the facts established that the harasser "created 'a work environment abusive' for female employees." *Id.* at 1507.

Although there are similarities between the conduct in the present case and in *Cross*. It is sufficiently distinguishable on the facts to warrant a different conclusion.

## B. Retaliation

Plaintiffs Wanda Shoemaker and Vicki Wright contend that Defendant retaliated against them after they complained about sexual harassment. Shoemaker contends that she was

41

terminated because of her complaints and Wright contends that she was transferred out of the ER because of her complaints.  Defendant contends that it is entitled to summary judgment on both Plaintiffs' retaliation claims.  Specifically, Defendant asserts (1) Wright's transfer was premised on the fact that "she was making life miserable for the other nurses in the ER," (2) her transfer was not an 'adverse' employment action, and (3) that there is a sufficient casual connection.  (Doc. 78, p. 26).  As to Shoemaker, it asserts that it had a legitimate business reason for the termination.  (*Id.* at 27-28).

In order to establish a prima facie case of retaliation in violation of Title VII, each Plaintiff must establish: (1) a statutorily protected expression;  (2) an adverse employment action;  and (3) a causal link between the protected expression and the adverse action.  *Gupta*, 212 F.3d at 587; *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)) (internal quotations omitted).  "Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action.  The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff."  *Id.*

### 1. Wanda Shoemaker

Defendant contends that Shoemaker was terminated for "falsification or improper

handling of records (personnel, payroll, other" as well as "dishonesty/fraud in attending

inservice class)." (Doc. 84, Ex. 35; *see also* Doc. 78, p. 27).

"The Eleventh Circuit has articulated two avenues by which an employee can prove

pretext when terminated for violation of a work rule: (1) that the employee did not violate the

work rule, or (2) that the employee did violate the work rule, but others who violated the rule

were afforded more favorable treatment. . . . [H]owever, an employer who fires an employee

under the mistaken but honest impression that the employee violated a work rule is not liable for

discriminatory conduct." *Smith v. International Paper Co.*, 2001 WL 1033564, *8-*9 (M.D.

Ala.) (citing *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir.

1999)).

Shoemaker has failed to produce substantial evidence that Defendant's articulated reason

for her termination for a work-rule violation was a pretext for retaliation. *See Smith*, at *8-*10.

Regarding the first prong, Shoemaker asserts that in the March 31, 1999 meeting that ended with

her termination, Chang

> absurdly insisted Ms. Shoemaker was guilty of falsification of records, dishonesty
> and fraud. Ms. Shoemaker was accused of falsifying payroll records that she did
> not even maintain. She was accused of dishonesty for failing to attend a course
> she was scheduled to attend on her day off. She later made up the course on her
> own personal time. It is significant that since Ms. Shoemaker had already worked
> her allotted 36 hours for that week, at least part of the time JCH claimed she
> should have been at the course would, in effect, have been overtime for which she
> clearly was not paid. Shoemaker never represented that she was at the course so
> there is clearly no fraud or dishonesty.

(Plaintiffs' Brief at 41-42).

The JCHA handbook states that the discipline for first time offenses involving

"[f]alsification of personnel or other records" and "[d]ishonesty, deception, or fraud" is

43

discharge. (Doc. 79, Tab 6, Bates No. 0099). The evidence shows that Shoemaker did not attend the October 16, 1998 class, but she was paid for the same. That constitutes dishonesty, deception, and fraud. It further results in false information being entered on her personnel records, that is, that she worked that day by attending the class. The fact that she later made arrangements to make up the class on her time does not change the nature of her previous conduct.[47] She may have mitigated her conduct by her subsequent actions and intentions; however, the conduct still violates Defendant's rules that provide for discharge. She has not met the first prong's showing of pretext.

To the extent that Shoemaker suggests that her conduct deserved some lesser punishment,[48] the court finds that any claim concerning proper punishment for violations of the work rules is basically a business decision which is not for this court to second-guess as a super-personnel department. *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (noting that court is not concerned with whether employment decision was prudent or fair but only with whether it was motivated by unlawful discriminatory animus), *cert. denied*, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000)).

Although not argued in her brief, Shoemaker asserted in her deposition that she was not disciplined for a similar incident a few years earlier (Shoemaker Depo. at 171) and that Suzanne

---

[47] Similarly, Shoemaker's lengthy recitation of the facts concerning this event (see Plaintiffs' Brief at 19-25) does not change the basic premise that she did not report her failure to attend the course when she was paid for doing so.

[48] According to Shoemaker, "[t]he record reflects in January 1999, inquiries were made regarding the nurses who attended the October 16-17 course for the ACLS provider certification. Ms. Tigue discovered that none of the nurses attended on October 17 and presumably all of their pay was adjusted to reflect only having attended an eight hour course." (Plaintiffs' Brief at p. 40). The record does not show that other employees were paid when they did not attend the course. To the contrary, the record shows that Shoemaker was not on the list of attendees. (Doc. 79, Tab 7, Defendant's Ex. 35, p. 3).

Arnold also missed a similar class and was not disciplined or questioned (*id.* at 169).[49] She also

stated that Cherie Sibley, the Director of Patient Care, told her that if she provided proof that she

had taken the make-up class, then JCH would reduce her check for eight hours and that would be

the end of the matter. (*Id.* at 173). This attempt to show pretext fits under the second prong

mentioned above. When examining this prong to determine whether the employee violated the

work rule while others who violated the rule were afforded more favorable treatment, the court

must be satisfied that the situations are sufficiently similar. As the Eleventh Circuit stated in

determining whether a prima facie has been shown, the court must be careful in making such

assessments:

> "In determining whether employees are similarly situated for purposes of
> establishing a prima facie case, it is necessary to consider whether the employees
> are involved in or accused of the same or similar conduct and are disciplined in
> different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311
> (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*,
> 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the
> disciplinary context are the nature of the offenses committed and the nature of the
> punishments imposed." *Id.* (internal quotations and citations omitted). We
> require that the quantity and quality of the comparator's misconduct be nearly
> identical to prevent courts from second-guessing employers' reasonable decisions
> and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*,
> 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary,
> but the cases must be fair congeners. In other words, apples should be compared
> to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999). Premised on what Shoemaker

has presented, the evidence is insufficient for this court to conclude that the plaintiff's previous

situation or Arnold's experience are sufficiently similar for comparison. For instance, nothing in

---

[49] However, neither the plaintiff's brief or deposition states what action, if any, was taken against Arnold. Defendant
contends that the Human Resources Director, Susanna Chang Lau, had the authority to make the decision to terminate
Shoemaker and that Lau made the decision consistent with Defendant's policy.

the record establishes that Arnold was paid for the class she attended or that her failure to attend

was brought to the attention of a relevant supervisor. Therefore, Defendant's motion for

summary judgment as to Shoemaker's retaliation claim is due to be granted.

### a.   Vicki Wright

#### i.   Adverse Employment Action

Defendant contends that Wright's transfer from the ER to another floor in the hospital

was not an "adverse employment action" because her pay was not reduced and she was given her

preferred work schedule. Wright, on the other hand, contends that transfer was an adverse

employment action because she could not continue to practice ER nursing.[50] (Plaintiffs' Brief at

26). She does not offer any case citation in support of the proposition that this is a sufficient

basis for a conclusion that a transfer is an adverse employment action.

In discussing what constitutes an adverse employment action, the Eleventh Circuit has

stated:

> A tangible employment action is "a significant change in employment
> status, such as hiring, firing, failing to promote, reassignment with significantly
> different responsibilities, or a decision causing a significant change in benefits."
> *Ellerth*, 524 U.S. at 761, 118 S. Ct. 2257. *See also Gupta*, 212 F.3d at 587
> (quotation omitted) (citation omitted) ("An adverse employment action is an
> ultimate employment decision, such as discharge or failure to hire, or other
> conduct that alters the employee's compensation, terms, conditions, or privileges
> of employment, deprives him or her of employment opportunities, or adversely
> affects his or her status as an employee.").

*Johnson*, 234 F.3d at 512. The court also noted that a plaintiff "must demonstrate that a

reasonable person in [her] position would have found [her] transfer to be adverse under all the

---

[50] She also asserts that this is exactly what Graham had wanted to have happen to her. (Plaintiffs' Brief at 43). However, nothing in the record, including Plaintiffs' brief, support a conclusion that Graham was involved in the decision to make the transfer. In fact, the record suggests the contrary because Reeves' memorandum of August 17, 1998, effectuating the transfer was authored almost two months after Defendant sent its third letter to HHA complaining about Graham.

facts and circumstances." *Id.* (quoting *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1453-54 (11ᵗʰ Cir. 1998)). "'The clear trend of authority,' . . . 'is to hold that a "purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action."' *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8ᵗʰ Cir. 1997) (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7ᵗʰ Cir. 1996)). *Brown v. Brody*, 199 F.3d 446, 455-56 (D.C. Cir. 1999) (citation omitted). The court in *Brown* adhered to the Supreme Court's recent interpretation of a "tangible employment action" as being "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 456 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).

Nothing in the record supports a conclusion that there is a substantial difference of responsibilities in ER nursing and floor nursing. To the contrary, the record demonstrates that nurses from other floors of the hospital worked in the ER.[51] The court cannot therefore conclude that "a reasonable person in [Wright's] position would have found [her] transfer to be adverse under all the facts and circumstances."[52] *Johnson*, 234 F.3d at 513 (11ᵗʰ Cir. 2000) (quoting *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1453-54 (11ᵗʰ Cir. 1998)).

---

[51] Counsel for Wright does not argue in her brief how the reassignment was an adverse employment action beyond a simple asserting that she was "unable to practice emergency nursing care." (Plaintiffs' Brief at 26, 43-44). That is not enough under existing law.

[52] Even though Wright's claims that she should have been transferred back to the ER in October 1998 is not properly before the court because it was not asserted in the complaint, and not mentioned in the pleadings until Plaintiffs' filed their brief in opposition to the summary judgment motion (Plaintiffs' Brief at 26), the court does not find that the failure to transfer her to an ER nurse position at that time is not an adverse job action.

47

### ii.    Pretext

Defendant argues that Plaintiff Wright cannot establish that its articulated, legitimate nondiscriminatory reason for her transfer is a pretext. Defendant contends that it transferred Wright because she was creating problems in the ER and other nurses were complaining about having to work with her. (Doc. 91, p. 10).

Plaintiff has not presented any evidence that Defendant's articulated reason is a pretext. *See* Doc. 84 (Plaintiffs' Brief in Response to Defendant's Motion for Summary Judgment), pp. 43-44. She merely argues that "the evidence reflects that she has met the essential elements of a retaliation claim and that is for the jury to determine whether or not any articulated reasons, and in particular, the reassignment because Ms. Wright was a problem, as opposed to Dr. Graham, are worthy of belief." *Id.* at 44. The court does not find this to be sufficient. The Eleventh Circuit Court of Appeals has stated:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan*, 100 F.3d at 1072 (citation and internal quotation marks omitted); *see also Walker*, 53 F.3d at 1564 (Johnson, J., concurring) (discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point,

judgment as a matter of law is unavailable.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

Under the circumstances, Wright has not "produc[ed] evidence sufficient to discredit in the mind of a reasonable juror . . . [D]efendant's proffered nondiscriminatory reason[ ] for its actions." *Id*. at 1543. Wright has not produced any evidence "to permit a reasonable juror to reject as spurious" Defendant's explanation for transferring her. *Id*. Her conclusory claim that it was precipitated by Graham is not sufficient. Therefore, Defendant's motion for summary judgment as to Wright's retaliation claim is due to be granted.

## IV.  CONCLUSION

Based on the foregoing, the court finds that Plaintiffs' motion to strike (doc. 94) is due to be granted and Defendant's motion for summary judgment (doc. 77) is due to be granted. Plaintiffs' claims are due to be dismissed with prejudice. An appropriate order will be entered.

**DONE**, this ___ day of January, 2002.

**JOHN E. OTT**
United States Magistrate Judge

49